**E-Filed 7/30/2007**

NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| DAVANZIA, S.L., <br><br>                Plaintiff, <br><br>                v. <br><br>LASERSCOPE, INC., et al., <br><br>                Defendants. | Case Number C 07-0247 JF (HRL) <br><br> ORDER[1] GRANTING MOTION TO DISMISS WITHOUT PREJUDICE <br><br> [re: docket no. 36] |

## I. BACKGROUND

This action arises from the now-terminated business relationship between plaintiff Davanzia, S.L. ("Davanzia") and defendant Laserscope, Inc. ("Laserscope"), which is now a subsidiary of American Medical Services, Inc. ("AMS"). Davanzia alleges that the parties' course of dealing was as follows:

Laserscope manufactures and supplies medical laser systems and their related energy delivery devices, i.e. fibers for urological surgery. Second Amended Complaint ("SAC") ¶ 7.[2]

---

[1] This disposition is not designated for publication and may not be cited.

[2] Davanzia has not included a number of factual allegations in the SAC that appeared in the first amended complaint ("FAC"). For example, Davanzia has removed references to the price of the Laserscope systems from the SAC. In the FAC, it alleged: "The retail price in Spain

In or about 2002, Laserscope began searching for a distributor to bring its systems to the Spanish market. SAC ¶ 8. Laserscope consulted with Jorge Garcia Martinez, now the President of Davanzia, about an exclusive distributorship. *Id.* On or about November 21, 2002, Davanzia and Laserscope entered into the Authorized International Distributor Agreement ("the Agreement").[3] *Id.* at ¶ 14. The Agreement provides that its initial term would end two years after the date of the purchase of the first demonstration/clinical unit. Agreement § VII.A. That unit was purchased on or about January 13, 2003. SAC ¶ 16.

Davanzia enjoyed great success bringing Laserscope products to the Spanish market, *Id.* at ¶ 29, and the Agreement automatically renewed after the expiration of the initial two-year term. *Id.* at ¶ 30. On or about May 18, 2006, Laserscope announced the upcoming launch of a new version of the GreenLight PV system called the GreenLight HPS laser system. *Id.* at ¶ 31. Davanzia ordered a total of twelve GreenLight HPS laser systems prior to August 25, 2006. *Id.* On or about June 5, 2006, AMS acquired Laserscope and made it an indirect wholly-owned subsidiary. *Id.* at ¶ 32. On or about September 11, 2006, Laserscope delivered a letter to Davanzia purporting to terminate the Agreement. *Id.* at ¶ 34. On or about November 3, 2006, Laserscope contacted Davanzia in writing, acknowledging a miscalculation of the termination date and stating a new termination date of January 13, 2007, the four-year anniversary of the purchase of the demonstration/clinical unit. *Id.* at ¶ 38. As of the filing of the SAC, five GreenLight HPS laser systems remain undelivered and owing. *Id.* at ¶ 39.

On January 12, 2007, Davanzia filed the initial complaint in this action. On January 23, 2007, Davanzia filed the FAC, which asserted three claims against defendants Laserscope and

---

for one such system, the GreenLight PV laser system, is approximately $175,000. The retail price in Spain for the newer version of the GreenLight laser system, the GreenLight HPS, is approximately $215,000. The retail price in Spain for GreenLight PV and HPS fibers, which are indispensable in the use of GreenLight PV and HPS laser systems, and are exclusively manufactured and supplied by Laserscope, is approximately $1,500.00 per fiber (irrespective of the higher purchase cost of HPS fibers). An average of one to two GreenLight PV or HPS fibers are used during the course of each surgery performed with a GreenLight PV or HPS laser system." FAC ¶ 7.

[3] The Agreement is included as Exhibit 1 to the SAC.

2

AMS: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; and (3) breach of express warranty. On March 12, 2007, Laserscope and AMS moved to dismiss the FAC. Laserscope moved to dismiss the claims for damages to the extent that they are based upon the termination of the Agreement. AMS moved to dismiss each claim against it on the basis that it is not a party to the Agreement. Davanzia opposed each aspect of the motion. On April 27, 2007, the Court dismissed the FAC with leave to amend ("April 27th Order"). It concluded that the interpretation of the Agreement argued by Davanzia was not reasonable on the record before the Court at that time. The Court also concluded that the FAC included insufficient allegations regarding alter-ego liability. The Court granted leave to amend to allege further facts suggesting that Davanzia's interpretation of the Agreement is reasonable and to allege alter-ego liability on the part of AMS.

On May 29, 2007, Davanzia filed the SAC. It asserts the same three claims in the FAC against the same defendants. In addition to factual allegations cited above, it makes allegations pertaining to the negotiation of the Agreement and to AMS' liability as an alter-ego of Laserscope. On June 12, 2007, Laserscope and AMS moved to dismiss the SAC. Both Laserscope and AMS move to dismiss the Complaint to the extent that its claims seek damages for the termination of the Agreement. AMS also moves to dismiss the Complaint in its entirety on the basis that Davanzia has not alleged alter-ego liability sufficiently. Davanzia opposes the motion. The Court heard oral argument on July 27, 2007.

## II. LEGAL STANDARD

For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

## III. DISCUSSION

1.      Claims for Damages Based Upon the Termination of the Agreement

As they did in the earlier motion practice, the parties dispute whether Laserscope's termination of the Agreement at the end of its second term constitutes a unilateral termination at will that would give rise to the payment of damages to Davanzia. The controlling provisions of the Agreement are as follows:

> VII. Term and Termination
> A. Term. **This Agreement will commence upon the Effective Date and will expire two (2) years after** *the date of purchase of the demonstration/clinical unit referred to in clause VI above*, **unless renewed or terminated as provided herein.**
> B. Renewal/Extension. *Once the initial term will elapse, this Agreement shall be automatically extended for subsequent terms of the same duration, unless either party notifies in writing to the other with not less than two (2) months notice, of its decision to terminate this Agreement upon expiry of its initial period or any extension thereof.*
> . . . .
> G. Termination for Convenience. **Either Party may terminate this Agreement, at will, at any time, with or without cause, by written notice to the other not less than sixty (60) days prior to the effective date of such notice.**
> . . . .
> K. Effect of Termination. **The provisions of this Agreement expressly concerning obligations of payment, confidentiality, indemnification, and provisions concerning Product warranties and limitations of liability, shall survive any expiration or termination of this Agreement for any reason**. *In the event of unfair termination, or termination at will by unilateral decision of either party, the other party shall be entitled to claim for damages caused by any such termination, which, for the Distributor will include its loss, among others, of present or prospective sales, investments, compensation or goodwill. In particular, Distributor's goodwill shall be assessed as the sum equal to its annual, average, gross sales margin (i.e. gross re-sale price of Products to its customers less gross purchase price from Laserscope) during the last five years, or for as long as this Agreement has been in force if less than five years.*

Agreement § VII (emphases in original).

Under California law, "the interpretation of a written contract is a matter of law for the court even though questions of fact are involved." *Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441, 1443 (9th Cir. 1986) (citations omitted). "In construing a contract, the primary object is to ascertain and give effect to the intention of the parties. That intention must, in the first instance, be derived from the language of the contract." *Hensler v. City of Los Angeles*, 124 Cal. App. 2d 71, 77 (Cal. Ct. App. 1954) (internal citations omitted). The interpretation of a contract "must be reasonable," *id.* (citing Cal. Civ. Code § 3542), and "[c]ourts should avoid an interpretation which will make a contract unusual, extraordinary, harsh, unjust or inequitable." *Id.* (citations omitted) (quotation marks omitted). "Preference must be given to reasonable interpretations as

4

opposed to those that are unreasonable, or that would make the contract illusory." *Id.* (citations omitted).

Davanzia contends, as it did in response to Laserscope's earlier motion to dismiss, that a termination on expiry (Section VII.B) should be treated as equivalent to a termination by will (Section VII.G) for the purposes of the damages available for a termination at will under Section VII.K. In granting Laserscope's first motion to dismiss, the Court found this interpretation unreasonable on the record before it. It explained:

> By its express terms, the Agreement renews automatically unless a party has given two month's notice of its intent to let the Agreement expire at the end of the two-year term. If, as Laserscope did in this case, the party gives such notice, the Agreement terminates "upon expiry." Agreement § VII.B. Section VII.G pertains to terminations during a term, not upon expiration of a term as provided by Section VII.B. A contrary reading of Section VII.G would render Section VII.B redundant. Accordingly, the Court concludes that termination upon expiration of a term, as provided for under Section VII.B, is not a termination at will that triggers damages under Section VII.K. Because Laserscope provided the notice required by Section VII.B and terminated the agreement "upon expiry," the motion to dismiss will be granted as to the claims for damages based upon the termination of the agreement.

April 27th Order 4-5 (footnotes omitted). The Court granted leave to amend because "Davanzia's counsel represented at oral argument that further facts could be pled with respect to the drafting history that would provide support for Davanzia's interpretation of the contract." *Id.* at 5.

While the SAC incorporates considerable argument in support of Davanzia's reading of the Agreement, it fails to allege further *facts* with respect to the drafting history. For example, the SAC alleges that "[t]he Parties agreed that without compensation to the non-terminating Party, a termination for convenience at the end or in the middle of a term would be unfair;" SAC ¶ 10; that "[f]or the Parties, there was no difference between a termination for convenience in the middle of a term or at the end of a term— and they did not intend to make such distinction in their contract;" SAC ¶ 11; and that "the Parties agreed that if either Party terminated the contract for convenience at the end of a term or in the middle of the term, it was obligated to compensate the other. The Parties also agreed that termination for convenience without compensation to the other Party was unfair." SAC ¶ 13. However, the SAC provides no details as to who said what,

5

to whom it was said, or when it was said. The closest approximation of a factual allegation is that "in the Parties' haste to finalize the contract, they failed to remove all vestiges of the then inapplicable concept that the contract would expire." SAC ¶ 12.

The Court concludes that these allegations do not render Davanzia's interpretation of the Agreement reasonable or the meaning of the Agreement ambiguous.[4]  As the Court explained in its prior order, the reasonable interpretation of the Agreement is that termination at the end of a term is treated differently than termination at will during a term.  While under certain circumstances a party may be able to plead sufficient *facts* to show that the parties to a contract intended an interpretation that differs from the unambiguous meaning of its language, Davanzia cannot avoid dismissal by alleging, without more, its own subjective understanding of the true purpose of the parties' contract.  Nothing in the Agreement is ambiguous.  Davanzia's alleged decision not to object to certain terms in order to ensure that its deal with Laserscope went through does not allow it to proceed as if the Agreement says what it now wishes it would have said.  This is particularly true given the integration clause included in the Agreement.  *See* Agreement § XII.A.  While counsel for Davanzia has articulated reasons why Davanzia may have wanted alternative language in the Agreement, the Court cannot read the Agreement, which was negotiated at arm's length and was discussed in at least two versions, in a manner that is inconsistent with its express terms.  Accordingly, because Davanzia has alleged no facts evidencing a mutual intent that the Agreement be construed in a way that would render Section VII.B redundant, the SAC will be dismissed to the extent that Davanzia seeks to recover damages for the termination of the Agreement.

2. Claims Asserted Against AMS

---

[4] *See Rogers v. Prudential Ins. Co.*, 218 Cal.App.3d 1132, 1136-37 (Cal. Ct. App. 1990) ("When the terms of an insurance policy are clear and unambiguous, the interpretation of the policy presents an issue of law which may be resolved by summary judgment. However, when the terms of a contract are ambiguous or uncertain, 'it is the duty of the trial court to construe it after the parties are given a full opportunity to produce evidence of the facts, circumstances and conditions surrounding its execution as well as the conduct of the parties to the contract,' and the interpretation of the policy presents a question of fact which is inappropriate for summary judgment.") (internal citations and quotation marks omitted).

Davanzia alleges the following as to AMS' liability under an alter-ego theory:

> Davanzia is informed and believes, and thereon alleges, that after the AMS acquisition, Laserscope is and was a mere shell, instrumentality and conduit of AMS. For example, Laserscope and AMS share the same CEO, President, Executive Vice-President, CFO and Secretary, whereas prior to the merger, Laserscope had its own officers; AMS controls Laserscope's operations, assets and products, as evidenced by AMS' ability to market and quickly sell half of Laserscope's business — the Aesthetics division; AMS has acknowledged, through public announcement, that it is responsible for Laserscope's obligations, that Laserscope and that AMS' businesses have combined, and that AMS' product line now includes Laserscope's products; and AMS' projected revenue set forth in publicly filed documents explicitly includes revenue generated by Laserscope. Facts such as these demonstrate that AMS has exercised complete control and dominance over Laserscope, such that any individuality or separateness of Laserscope, on the one hand, and AMS, on the other hand, did not exist at any relevant time. As a result, AMS should be held fully liable for the wrongs of Laserscope. Such alter ego liability is necessary and appropriate because adhering to the fiction of Laserscope's separate existence would, under the circumstances of this case, sanction fraud and promote injustice, unfairness and inequity.

SAC ¶ 45.  "In general, the two requirements for applying the alter-ego doctrine are that (1) there is such a unity of interest and ownership between the corporation and the individual or organization controlling it that their separate personalities no longer exist, and (2) failure to disregard the corporate entity would sanction a fraud or promote injustice.  The doctrine is applicable where some innocent party attacks the corporate form as an injury to that party's interests."  *Robbins v. Blecher*, 52 Cal.App.4th 886, 892 (1997); *see also Institute of Veterinary Pathology, Inc. v. California Health Lab, Inc.*, 116 Cal. App. 3d 111, 119 (1981).

Because the Court concludes that the SAC includes insufficient allegations to justify the imposition of alter-ego liability, the SAC will be dismissed as to AMS.  With respect to the first prong of the alter-ego inquiry, Davanzia alleges facts that are not unusual in parent-subsidiary relationships.  *See e.g. In re Automobile Antitrust Cases I and II*, 135 Cal. App. 4th 100, 120 n.10 (Cal. Ct. App. 2005) (describing, in the context of agency law, interlocking directors and officers, consolidated reporting and shared professional services as common characteristics of a parent-subsidiary relationship); *Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1269, 1285 (Cal. Ct. App. 1994) (describing as "woefully short" for the purposes of imposing alter-ego liability allegations that "the parent company owned 100 percent of the subsidiary's stock, it shared office space and policy manuals with the subsidiary, they had some common personnel, and they had

consolidated financial statements"). "Alter ego is a limited doctrine," *id.*, and the Court will not expand it by applying it to allegations that describe a typical parent-subsidiary relationship. Davanzia's allegations with respect to the second prong of the alter-ego inquiry are cursory and conclusory. Davanzia does not allege, for example, that Laserscope is inadequately capitalized.

3.   Future Amendment

At oral argument, counsel for Davanzia did not identify any further facts that could be pled as to the negotiation of the Agreement. Amendment of the alter-ego allegations also appears futile at this time. However, in light of the fact that the action will proceed on other claims made in the SAC, the Court concludes that it is possible that discovery will reveal additional facts relevant to the negotiation of the Agreement or the relationship between AMS and Davanzia. Accordingly, the motion to dismiss will be granted without prejudice to a future motion for leave to amend should discovery reveal such relevant facts.

### IV.  ORDER

Good cause therefor appearing, IT IS HEREBY ORDERED that the motion to dismiss is GRANTED without prejudice.

DATED: July 30, 2007

_____
JEREMY FOGEL
United States District Judge

Case No. C 07-0247 JF (HRL)
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE
(JFLC1)

1  This Order has been served upon the following persons:

2  Margaret Anne Crawford          maggie.crawford@dlapiper.com,
                                   larry.landry@dlapiper.com
3
   William J. Frimel               bill.frimel@dlapiper.com, carmen.manzano@dlapiper.com
4
   Dianne L. Sweeney               dianne@pillsburylaw.com, meri@pillsburylaw.com;
5                                  louis.santaana@pillsburylaw.com;
                                   janice.hall@pillsburylaw.com;
6                                  al.guzman@pillsburylaw.com

7  Notice will be delivered by other means to:

8  Gary Hansen & Heather N. Hoecke
   Oppenheimer Wolff & Donnelly LLP
9  45 South Seventh Street
   Suite 3300
10 Minneapolis, MN 55402

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

Case No. C 07-0247 JF (HRL)
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE
(JFLC1)